Town of Beloit, Petitioner-Third-Party
Defendant-Appellant,

v.

County of Rock, Respondent-Respondent,

v.

Belle Zyla, Marvin Prothero, and Green-Rock Au-
dubon Society, Intervenors-Third-Party Plaintiffs-
Respondents-Petitioners.

Supreme Court

*No. 00–1231. Oral argument September 10, 2002.—Decided
March 4, 2003.*

2003 WI 8

(Also reported in 657 N.W.2d 344.)

For the intervenors-third-party plaintiffs-respondents-petitioners there were briefs by *Joseph R. Cincotta* and *Schweitzer & Cincotta LLP,* Milwaukee, and oral argument by *Joseph R. Cincotta.*

For the respondent-respondent there was a brief and oral argument by *Eugene R. Dumas,* deputy corporation counsel.

For the petitioner-third-party defendant-appellant, there was a brief by *Kenneth W. Forbeck* and *Forbeck, Elliott, Monahan & Schomber, S.C.,* Beloit, and oral argument by *Kenneth W. Forbeck.*

An amicus curiae brief was filed by *Claire Silverman,* Madison, on behalf of the League of Wisconsin Municipalities.

An amicus curiae brief was filed by *Carol B. Nawrocki,* Shawano, on behalf of the Wisconsin Towns Association.

¶ 1. N. PATRICK CROOKS, J. Belle Zyla, Marvin Prothero, and the Green-Rock Audubon Society (Intervenors) petitioned for review of a court of appeals decision, which reversed and remanded the decision of the Circuit Court for Rock County, William D. Johnston, Circuit Court Judge. The court of appeals held that the Town of Beloit (town)[1] has the statutory authority to spend public tax monies to develop and sell property in the Heron Bay subdivision, and that the town's goals in developing the subdivision constitute legitimate and valid public purposes.[2]

¶ 2. We affirm the court of appeals decision. In *Libertarian Party of Wisconsin v. State,* 199 Wis. 2d 790, 809, 546 N.W.2d 424 (1996), this court held that creating jobs and enhancing the tax base were legitimate and valid reasons, along with others, for finding a legislative public purpose in the expenditure of public funds to build the Milwaukee Brewers' Miller Park. Accordingly, we hold that the combination of the town's enunciated goals of creating jobs, promoting orderly growth, increasing the tax base, and preserving and conserving an environmentally sensitive area for the benefit of the citizens of the town is a legitimate and

---

[1] The word "town" refers to actions taken by the town's officials, such as the Town Board, and the Town Administrator unless otherwise indicated.

[2] Rock County (county) joins the Intervenors in this action. As a result, all references to the Intervenors include Rock County.

valid public purpose under Wisconsin statutes, case law, and the United States and Wisconsin Constitutions. Def. Appellant Br. at 20.[3]

¶ 3. In 1999 the Town of Beloit commenced this action in the circuit court when it filed a petition for a writ of certiorari complaining that the respondent, County of Rock, lacked authority to impose certain conditions on the town's proposed subdivision plat.[4] While this certiorari action was pending in the circuit court, Belle Zyla, Marvin Prothero, and the Green-Rock

---

[3] *See also,* Town Attorney Kenneth Forbeck Affidavit, ¶ 23 stating that "the [town's] purpose of development has been to develop jobs, a greater tax base for the community and places for its citizens to live."

[4] The County of Rock (county) granted approval for the development of the Heron Bay lands conditioned upon seven modifications. The Town of Beloit (town) challenged only one of these conditions, which pertained to the best method for preserving the 300-foot area along the Rock River. At the Rock County Planning and Development Committee (committee) Meeting of April 7, 1999, the committee discussed its staff recommendations regarding conditions for approval of the Heron Bay Subdivision proposal from the Town of Beloit. (Intervenors-Third-Party-Pls.'-Resp't-Pet'r App. at 63–76.) The following seven conditions were outlined.

The first condition advanced by the committee required two access points into the division, while the second condition called for road name changes at each direction change in the road. *Id.* at 65. The third requirement regarding storm water runoff on site was resolved between the town and county engineers. *Id.* The fourth condition required that 300 feet along the Rock River be dedicated as park and open space which would allow it to be open to the public, left in its natural state and subject to restrictive covenants. *Id.* The fifth condition required the subdivision lots to be redrawn while the sixth called for a green space easement to preserve the natural vegetation, which in turn would act as a buffer zone for the DNR natural area. *Id.* at

Audubon Society (Intervenors) filed a motion to intervene and a complaint for declaratory judgment, on the basis that the town exceeded its authority in both preparing and approving the subdivision plat and in developing the subdivision without a public purpose.

¶ 4. The town then filed a motion for summary judgment. In its brief in support of the motion and an attached affidavit, the town asserted that, prior to hiring its own engineering firm to plat the property, it sought proposals from private builders. However, the town found all submitted proposals to be unacceptable. Accordingly, the town argued, it was proper for the town to develop its own land as a means of increasing the town's tax base and controlling orderly expansion of the area. Additionally, by creating and enforcing a 300-foot conservation easement along the Rock River, the town asserted it was acting to protect and preserve an environmentally sensitive area. Finally, the town

66. Finally, the seventh condition provided by the county required a ten-foot walkway to the park and open space from Heron Circle. *Id.*

The Town of Beloit municipal attorney, Kenneth Forbeck, represented the town at this meeting. He indicated that the town would acquiesce to many of the conditions set forth by the county, except for the fourth condition requiring dedication of the 300-foot area along the Rock River as public lands. *Id.* at 69. Forbeck stated that the town believed the best way to preserve this area would be to prevent it from being overrun by the public. *Id.* at 75. To prevent this from happening, the town proposed extending the lots that ran along the river to include the 300-foot area of concern by the county and controlling the use of this area through restrictive covenants thereby prohibiting development in this area without permission. *Id.* The town also desired to enact an environmental easement in addition to the restrictive covenants that would equip the town with the ability to enforce the restrictions. *Id.* at 76.

alleged that it acted properly in reviewing its own subdivision proposal because it complied with all of the requirements of Wis. Stat. ch. 236 (1999–2000)[5] by submitting its proposal to all appropriate political bodies.

¶ 5. The Intervenors, including Rock County, filed briefs in opposition to the town's motion. The circuit court denied the town's motion for summary judgment against the Intervenors and instead issued summary judgment in favor of the Intervenors.

¶ 6. The court of appeals reversed the decision that granted summary judgment in favor of the Intervenors, and instead granted summary judgment against the Intervenors, and remanded the case for further proceedings. The court of appeals held that the town had statutory authority to develop and plat the Heron Bay Subdivision, and that the town's goals in developing Heron Bay constituted a public purpose.

¶ 7. The Intervenors sought review of the court of appeal's decision, regarding the public purpose doctrine. On January 29, 2002, this court accepted review.

¶ 8. The following are stipulated facts. The town currently owns a 20.4 acre parcel of land located in the Town of Beloit, Rock County, along the Rock River. The parcel is known as the "Heron Bay Lands." The Heron Bay Subdivision is a 20.4-acre parcel of property located in the SE 1/4 of the SW 1/4, Section 2, Town of Beloit, Rock County, and located between the Rock River and Walters Road (R. 29). The Heron Bay Lands have been open to and used by members of the public for recreation.

---

[5] All references to the Wisconsin Statutes are to the 1999–2000 version unless otherwise indicated.

¶ 9. The history of this property prior to 1995 is incomplete. However, according to the record, early owners of this land used it for farming for 30–40 years (R. 39). The land was then purchased by the town and held, off and on, since the mid 1960s (R. 39).

¶ 10. The Caterpillar Company (Caterpillar) purchased the land owned by the town, along with additional parcels from individual property owners, for possible industrial development (R. 23). After encountering some economic problems, Caterpillar decided not to develop the property (R. 39). Thereafter, the town exercised its right to buy back the property and purchased approximately 210 acres from Caterpillar, including the lands originally owned by the town and additional private lands (R. 23). This property became known as the "Prairie Property." Fifty-five acres of the property were designated the "Heron Bay Lands," a portion of which is at issue in this case (R. 29).

¶ 11. In the 1980s, the town's attempt to sell the land to a Beloit businessman, who proposed developing fourteen lots on the then 55-acre parcel, failed (R. 39). Subsequent attempts to develop the land in 1990s were also unsuccessful (R. 39). From 1989 to 1995, the town worked with the Wisconsin Department of Natural Resources (DNR) after it had expressed an interest in purchasing a portion of this property (R. 23, 39). In order to grant the DNR's request to purchase the land, the town divided the property into two parcels (R. 23). The 37-acre parcel was zoned as a Conservancy District while the other 20.4-acre parcel was retained by the Town of Beloit (R. 29).[6] The parcel that the town

---

[6] Although the briefs filed by the town and the Intervenors refer to the parcel of land being 35 acres or more, the record reflects, in the stipulated facts, that "[u]p until 1995, the town

retained, which eventually became the Heron Bay Sub-division, was zoned as a Single Family Residential District in 1995 (R. 29). In October 1995, the 37-acre parcel was sold to the Department of Natural Resources for the preservation of rare species and to be main-tained for public use (R. 23, 29). The town made it clear to the DNR and other interested parties that the 20.4-acre parcel was retained specifically for residential development. In fact, as part of the purchase agree-ment, the DNR agreed not to pursue purchase of the Heron Bay Subdivision and agreed not to oppose resi-dential development (R. 24).

¶ 12. In 1997, after years of attempted develop-ment by private individuals, the town decided to de-velop the land known as the Heron Bay Subdivision. Initially, the town sought approval for its master plan by the Town Board of the Town of Beloit (Board). After several meetings, the town adopted the Master Plan. The town developed and distributed a Request for Proposal (RFP) to area builders as well as other build-ers, but did not garner significant interest or acceptable results (R. 24). The town reviewed the various propos-als sought and submitted to develop the Heron Bay Subdivision (R. 24). The proposals were rejected be-cause they either had not responded to the request, or the proposals were apparently unacceptable for various reasons (R. 24). As a result of this lack of interest and the inadequacy of the proposals, the town decided that

owned an additional 37 acres of land directly to the south and contiguous to the Heron Bay Lands." We note that the 55 acres designated as the "Heron Bay Lands," less the 37 acres sold to the Department of Natural Resources, leaves less than the 20.4 acres the record reflects were retained for residential develop-ment. This discrepancy is not a determinative factor in our decision.

47

the town would develop the site, agreeing that the town would benefit from the development (R. 24).

¶ 13. At a 1997 Town of Beloit Board of Supervisor's meeting, the town approved a "Master Plan" for the Heron Bay Lands, zoning it for single-family residential housing. At a subsequent meeting in December 1998, the town authorized and approved the expenditure of town tax revenues for planning and platting services to develop the land. The town authorized an engineering firm to produce a plan to develop the Heron Bay Lands into a thirty-six-lot, single-family residential subdivision and to submit the plan to the State of Wisconsin. The town also authorized the bidding of contracts necessary for engineering and construction of the infrastructure. It is the development by the town and sale of the remaining 20.4-acre parcel, known as the Heron Bay Subdivision, which is at issue in this case.

¶ 14. The town considered and approved a preliminary plat for the subdivision. The preliminary plat was forwarded to Rock County for its review and approval. After Rock County's initial review, the subdivision was reduced from thirty-six lots to twenty-four lots. Rock County then conditionally approved the twenty-four-lot preliminary plat subject to various conditions, including the 300-foot-wide environmental easement commencing on the bank of the Rock River and extending the entire eastern border of the property.[7]

---

[7] The record reflects that the town initially intended to preserve this conservancy or environmental area by the use of restrictive covenants. Use of such restrictive covenants was discussed at workshops in February 1999. (Savage, Town Administrator, Aff.) (R. 24).

¶ 15. The town's Planning Commission then reviewed the preliminary plat. In December 1998, the town authorized its engineers to provide planning and platting services to create what was to be called the Heron Bay Subdivision (R. 29). In January 1999, one month later, the town authorized the engineers to proceed with plans, specifications, and bidding on the Heron Bay Subdivision infrastructure (R. 29).

¶ 16. Although the town ultimately approved the twenty-four-lot preliminary plat, it filed a petition for writ of certiorari in May of 1999, seeking to reverse Rock County's conditional approval based on the town's assertion that Rock County did not have the statutory authority to impose certain conditions.

¶ 17. After the filing of the petition, the town authorized the expenditure of over $600,000 in town tax revenues for the development and construction of waste and "sewerage piping" with the intent that it serve both the future Heron Bay Lands subdivision and over 1500 additional acres of land in the area. *See Town of Beloit v. County of Rock*, 2001 WI App 256, 249 Wis. 2d 88, 637 N.W.2d 71.

¶ 18. The above facts are stipulated; however, the record reflects that underlying the town's decision to develop the land itself was a desire to create jobs, increase the tax base, and promote orderly growth of single family housing to benefit members of the community (R. 23). In addition, the record reflects the town's concern over preservation of the environmentally sensitive land. The town ultimately determined that it was its duty to ensure that an ecologically fragile area was properly developed, and the best way to accomplish this goal was to carry out the development itself (R. 30). In carrying out that goal, the town decided to utilize a conservation or environmental easement to

49

preserve the east 300 feet of the subdivision in lieu of less effective restrictive covenants (R. 23).

¶ 19. The issue presented for this court to decide is whether the court of appeals erred in upholding the Town of Beloit's expenditure of public tax monies to develop and sell municipally-owned property in accord with the public purpose doctrine, based on the combined goals of promoting orderly growth, creating jobs, increasing the tax base, and preserving and conserving environmentally sensitive areas.

■

¶ 20. This case involves a question of whether the Town of Beloit violated the public purpose doctrine. Although there is no specific clause in the Wisconsin Constitution establishing the public purpose doctrine, this court has recognized that the doctrine is firmly accepted as a basic constitutional tenet of the Wisconsin Constitution and the United States Constitution, mandating that public appropriations may not be used for other than public purposes.[8] *State ex rel. Bowman v.*

---

[8] *See State ex rel. Warren v. Nusbaum,* 59 Wis. 2d 391, 413 n.8, 208 N.W.2d 780 (1973):

The origin of the public purpose doctrine has been variously attributed by this court to the due process and equal protection clauses of the state and federal constitutions, *State ex rel. Wisconsin Development Authority v. Dammann* (1938), 228 Wis. 147, 277 N.W. 278, 280 N.W. 698; art. IV, sec. 4, of the United States Constitution, which guarantees to every state a republican form of government, *Heimerl v. Ozaukee County* (1949), 256 Wis. 151, 40 N.W.2d 564; and art. VIII, sec. 2, of the Wisconsin Constitution which provides that no money shall be paid out of the treasury except in pursuance of an appropriation by law, *State ex rel. La Follette v. Reuter* (1967), 33 Wis. 2d 384, 147 N.W.2d 304. Other authors have attributed the doctrine to judicial articulation of the belief that governmental power should be used for the benefit of the entire community. Mills, *The Public Purpose Doctrine in Wisconsin,* 1957 Wis. L. Rev. 40. *See also: State ex rel. Bowman v.*

*Barczak,* 34 Wis. 2d 57, 62, 148 N.W.2d 683 (1967). Courts are to give great weight and afford very wide discretion to legislative declarations of public purpose, but are not bound by such legislative expressions. *State ex rel. Hammermill Paper Co. v. La Plante,* 58 Wis. 2d 32, 205 N.W.2d 784 (1973). It is the duty of this court to determine whether a public purpose can be conceived, which might reasonably be deemed to justify the basis of the duty. *Libertarian Party of Wis. v. State,* 199 Wis. 2d 790, 809, 546 N.W.2d 424, (1996). As we have stated:

> Under the public purpose doctrine, "[w]e are not concerned with the 'wisdom, merits or practicability of the legislature's enactment.' Rather we are to determine whether a 'public purpose can be conceived which might reasonably be deemed to justify or serve as a basis for the expenditure.' " A court can conclude that no public purpose exists only if it is 'clear and palpable' that there can be no benefit to the public."

*Jackson v. Benson,* 218 Wis. 2d 835, 896, 578 N.W.2d 602 (1998) (citations omitted).

¶ 21. Consequently, a conclusion that no public purpose exists can be determined only if it is "clear and palpable" that there can be no benefit to the public. *West Allis v. Milwaukee County,* 39 Wis. 2d 356, 377, 159 N.W.2d 36 (1968); *Hammermill,* 58 Wis. 2d at 56.

I

¶ 22. The court of appeals was correct in holding the town had the statutory authority to develop Heron Bay. The town adopted village powers "as early as April,

*Barczark* (1967), 34 Wis. 2d 57, 62, 63, 148 N.W.2d 683; Eich, *A New Look At The Internal Improvements And Public Purpose Rules,* 1970 Wis. L. Rev. 1115.

51

1949" (R. 24). While neither the Intervenors nor Rock County disputes that the town had authority to act as a subdivider under the general powers granted to a village in Wis. Stat. § 61.34(1), (3) and (5),[9] a brief

[9] 61.34 Powers of village board. (1) GENERAL GRANT. Except as otherwise provided by law, the village board shall have the management and control of the village property, finances, highways, streets, navigable waters, and the public service, and shall have power to act for the government and good order of the village, for its commercial benefit and for the health, safety, welfare and convenience of the public, and may carry its powers into effect by license, regulation, suppression, borrowing, taxation, special assessment, appropriation, fine, imprisonment, and other necessary or convenient means. The powers hereby conferred shall be in addition to all other grants and shall be limited only by express language.

. . . .

(3) ACQUISITION AND DISPOSAL OF PROPERTY. The village board may acquire property, real or personal, within or outside the village, for parks, libraries, recreation, beautification, streets, water systems, sewage or waste disposal, harbors, improvement of watercourses, public grounds, vehicle parking areas, and for any other public purpose; may acquire real property within or contiguous to the village, by means other than condemnation, for industrial sites; may improve and beautify the same; may construct, own, lease and maintain buildings on such property for instruction, recreation, amusement and other public purposes; and may sell and convey such property. Condemnation shall be provided by ch. 32.

. . . .

(5) CONSTRUCTION OF POWERS. For the purpose of giving to villages the largest measure of self-improvement in accordance with the spirit of article XI, section 3, of the constitution it is hereby declared that this chapter shall be liberally construed in favor of the rights, powers, and privileges of villages to promote the general welfare, peace, good order and prosperity of such villages and the inhabitants thereof.

analysis of the town's statutory authority is necessary for a complete understanding of the public purpose doctrine in Wisconsin.

■■■

¶ 23. The Legislature has plenary power to act except where forbidden by the Wisconsin Constitution. *Libertarian Party,* 199 Wis. 2d at 801. As noted in *Heimerl v. Ozaukee County,* 256 Wis. 151, 40 N.W.2d 254 (1949) (Broadfoot, J., dissenting) (citing 16 C.J.S., Constitutional Law, 550, sec. 182):

> The preamble of our state constitution provides that one of the main purposes in establishing our state government is to promote the general welfare. The police powers of the state are inherent and are only limited by the constitution.

> "The real object of the police power, and that indeed which in its broad sense includes every instance of its exercise, is the securing of the general welfare, comfort, and convenience of the people."

*Id.* at 161 (Broadfoot, J., dissenting). Pursuant to the village powers under Wis. Stat. § 60.10(2)(c)[10] and Wis. Stat. § 60.22(3)[11] the town may exercise powers relating to villages and conferred on village boards under Chapter 61 of Wis. Stats., except those powers which conflict

---

[10] 60.10(2)(c). Exercise of village powers. Authorize the town board to exercise powers of a village board under s. 60.22(3). A resolution adopted under this paragraph is general and continuing.

[11] 60.22 General powers and duties. The town board:

. . . .

(3) VILLAGE POWERS. If authorized under s. 60.10(2)(c), may exercise powers relating to villages and conferred on village boards under ch. 61, except those powers which conflict with statutes relating to towns and town boards.

with statutes relating to towns and town boards.[12] Here, it does not appear that the village powers conflict with statutes relating to towns and town boards.[13] Accordingly, the court of appeals was correct in holding that there was no legal prohibition which prevented the town from subdividing property which it owned pursuant to subsections (1), (3) and (5) of Wis. Stat. § 61.34. *See Town of Beloit,* 2001 WI App 256 at ¶ 15.

## II

¶ 24. Although the town's authority to act as a subdivider under the general powers granted to a village in Wis. Stat. § 61.34(1), (3) and (5) is not disputed, the creation of the subdivision involved the expenditure of public funds. It is the town's expenditure of tax monies to develop and sell the land in the Heron Bay subdivision that constitutes the central dispute in this case.

¶ 25. Specifically, the Intervenors maintain that a public purpose can only be found when the "subject matter of legislative action is carrying out or implementing a traditional public function, and is public in nature." Pet'r Br. at 18 (citing the two-prong test of *State ex rel. Wisconsin Dev. Auth. v. Dammann,* 228 Wis. 147, 280 N.W. 698 (1938)). Based on the two-prong test of *Dammann,* which requires that the public purpose be of public necessity, convenience or welfare, and difficult for individuals to provide for themselves, the Intervenors assert that the "development of a residential for-profit river-front subdivision" is not a traditional public function, and therefore, it fails the first

---

[12] *Id.*

[13] *See* Wis. Stat. §§ 60.10(2), 61.34(3) and 60.10(2)(g).

prong of the test rendering the town's expenditures unconstitutional. Pet'r Br. at 24.

¶ 26. In order to address the Intervenor's argument, an analysis of the public purpose doctrine and its application by Wisconsin courts is necessary.

■

¶ 27. As briefly discussed earlier, although there is no specific language in the state constitution establishing the public purpose doctrine, this court has recognized that the doctrine is firmly accepted as a basic constitutional tenet mandating that public appropriations may not be used for other than public purposes. *State ex rel. Bowman v. Barczak,* 34 Wis. 2d 57, 62, 148 N.W.2d 683 (1967); *State ex rel. Hammermill Paper Co. v. La Plante,* 58 Wis. 2d 32, 47–48, 205 N.W.2d 784 (1973). The public purpose doctrine commands that public funds be used only for public purposes. *State ex rel. Warren v. Reuter,* 44 Wis. 2d 201, 211, 170 N.W.2d 790 (1969); *State ex rel. Warren v. Nusbaum,* 59 Wis. 2d 391, 414, 208 N.W.2d 780 (1973). In *Reuter,* this court described the public purpose concept as fluid:

> "[T]he concept of public purpose is a fluid one and varies from time to time, from age to age, as the government and its people change. Essentially, public purpose depends on what the people expect and want their government to do for the society as a whole and in this growth of expectation, that which often starts as hope ends in entitlement."

*Reuter,* 44 Wis. 2d 201, 213. As a result, it is a well-settled rule that the legislative body determines what constitutes a public purpose, and that "[C]ourts will not interfere unless at first blush the act appears to be so obviously designed in all its principal parts to benefit private persons and so indirectly or remotely to affect

55

the public interest that it constitutes the taking of property of the taxpayers for private use." *State ex rel. Bowman v. Barczak,* 34 Wis. 2d 57 at 64 (quoting *State ex rel. Wisconsin Dev. Auth. v. Dammann,* 228 Wis. 147, 182, 277 N.W. 278, 280 N.W. 698 (1938)).

¶ 28. Although courts are not bound by legislative expressions of public purposes, they nevertheless have a constitutional burden to examine legislative actions for the existence of a public purpose pursuant to the Wisconsin Constitution. *Nusbaum,* 59 Wis. 2d 391. However, the court's duties are limited to determining whether the legislation contravenes the provisions of the constitution. The presumption of constitutionality is applicable in making such a determination. *Hammermill,* 58 Wis. 2d at 46–47. As such, courts are to give great weight to the opinion of the legislative body, and "[i]f any public purpose can be conceived which might rationally justify the expenditure, the constitutional test is satisfied." *Bishop v. City of Burlington,* 2001 WI App 154, ¶ 11, 246 Wis. 2d 879, 631 N.W.2d 656 (citations omitted). Consequently, a court will conclude that there is no public purpose only if it is "clear and palpable that there can be no benefit to the public". *Id.* (citations omitted).

¶ 29. In determining whether a public purpose exists, courts have considered whether the subject matter or commodity of the expenditure is one of "public necessity, convenience or welfare," as well as the difficulty private individuals have in providing the benefit for themselves. *Dammann,* 228 Wis. 2d at 182; *see also Libertarian Party,* 199 Wis. 2d at 810. Courts also look to see if the benefit to the public is direct or remote. *Bowman,* 34 Wis. 2d at 64. Additionally, pro-

vided that the primary purpose of the expenditure is designed for a public purpose, any direct or incidental private benefit does not destroy the public purpose and render the expenditure unconstitutional. *Libertarian Party,* 199 Wis. 2d at 810.

¶ 30. Because of the accepted view that local governments are often in the best position to determine the needs of the public in that locality, Wisconsin municipalities have traditionally been given wide discretion to determine whether a public expenditure is warranted due to public necessity, convenience, or welfare. As such, the public purpose doctrine has been broadly interpreted.[14]

¶ 31. A review of Wisconsin case law illustrates that the trend of Wisconsin courts is to extend the concept of public purpose.

¶ 32. In *Bowman,* 34 Wis. 2d at 64–65, the industrial development through the creation of separate county agencies and bond issues, pursuant to Wis. Stat. § 59.071, was determined to be a valid constitutional enactment as it related to a declaration of public purpose. In *West Allis v. Milwaukee County,* 39 Wis. 2d 356, 159 N.W.2d 36 (1968), construction of incinerators and waste disposal facilities was considered a public purpose. In addition, financial aid to the Marquette School of Medicine (now the Medical College of Wiscon-

---

[14] *State ex rel. Hammermill Paper Co. v. La Plante,* 58 Wis. 2d 32, 55–56, 205 N.W.2d 784 (1973) (holding that "[t]he trend of both legislative enactments and judicial decisions is to extend [the public purpose] concept . . . in considering the demands upon municipal governments to provide for the needs of the citizens"); *State ex rel. Bowman v. Barczak,* 34 Wis. 2d 57, 64, 148 N.W.2d 683 (1967) (holding that "the tendency of later cases is toward greater liberality in characterizing taxes or appropriations as public in purpose . . .").

sin), a private nonprofit corporation, was upheld on the premise that public health is a public purpose. *See State ex rel. Warren v. Reuter,* 44 Wis. 2d 201, 170 N.W.2d 790 (1969). This court upheld the industrial bonding law under Wis. Stat.. § 66.521 (1969), as a public purpose, because the protection of the economic interests of the general public fell within the scope of promotion of the general welfare. *Hammermill,* 58 Wis. 2d at 55–56. Similarly, the elimination of unsafe, unsanitary and overcrowded housing was found to promote the overall public purpose of providing stable residences for those of lower income. *Nusbaum,* 59 Wis. 2d 391.

¶ 33. A few years later, this court upheld the creation and operation of the Wisconsin solid waste recycling authority, in part because "recycling can be defined as a means of garbage collection, and, as such, has been denominated as clearly a matter justifying expenditure of public funds." *Wisconsin Solid Waste Recycling Auth. v. Earl,* 70 Wis. 2d 464, 480–81, 235 N.W.2d 648 (1975).

¶ 34. Recently, Wisconsin courts have continued the liberal application of the public purpose doctrine. In 2001, the court of appeals held that the construction of a parking lot to promote rehabilitation of the downtown area was held to be a public purpose. *Bishop v. City of Burlington,* 2001 WI App 154, ¶ 11, 246 Wis. 2d 879, 631 N.W.2d 656 (citations omitted). In a similar vein, a city's expenditure of funds to increase the tax base and generally enhance the economic climate of the community was held to satisfy the public purpose doctrine. *Alexander v. City of Madison,* 2001 WI App 208, 247 Wis. 2d 576, 634 N.W.2d 577.

¶ 35. Most significantly, this court was recently presented with the question of whether the expenditure of public funds for the construction of the new Milwau-

kee Brewers' Miller Park satisfied the public purpose doctrine. The purported goals of creating jobs and enhancing the tax base were held to be valid reasons, along with other reasons, by this court. In our analysis, we recognized that enhancing the tax base and creation of new jobs are legitimate and valid public purposes, and held that:

> The purpose of the Stadium Act is to promote the welfare and prosperity of this state by maintaining and increasing the career and job opportunities of its citizens and by protecting and enhancing the tax base on which state and local governments depend upon. It is clear that the community as a whole will benefit from the expenditures of these public funds. Creation of new jobs is of vital importance to the State of Wisconsin and economic development is a proper function of our government.

*Libertarian Party,* 199 Wis. 2d at 826.

¶ 36. Accordingly, the goal of increasing the tax base, as well as creation of new jobs, has been recognized by this court, and other Wisconsin courts to be a legitimate and valid public purpose justifying the expenditure of public funds. *Id.; Alexander,* 2001 WI App 208.

¶ 37. In addition to Wisconsin case law acknowledging the town's expenditures here as involving traditionally and expressly recognized public purposes, it is clear from the record that the public welfare has been, and continues to be, the basis of the town's decision-making process. *See Dammann,* 228 Wis. at 182, (whether the subject matter or commodity of the expenditure is one of "public necessity, convenience or welfare").

¶ 38. As discussed previously, the town originally owned the property in dispute and sold it to the

Caterpillar Company for purposes of industrial development. Caterpillar determined not to develop the site and the town repurchased the land. In the 1980s the town failed to sell the land to a developer (R. 39). Attempts to develop the land in the 1990s were similarly unsuccessful. *Id.*

¶ 39. Nevertheless, the town, as part of its duties to the citizens of the town, continued to find ways to utilize the land for the public benefit. In order to preserve the environmentally sensitive land, the town worked with the DNR from 1989 to 1995, and eventually sold 37 acres to the DNR in October of 1995, for the preservation of rare species and to be maintained for public use (R. 23, 29).

¶ 40. In 1997, after years of attempted development by private individuals, the town itself decided to develop the land known as the Heron Bay Subdivision.

¶ 41. The record is replete with references to the underlying reasons for the town's decision to develop the Heron Bay Subdivision. In particular, the town was motivated to develop the land by its desire to create jobs, expand the tax base and create an orderly growth of single family housing for the benefit of members of the community (R. 23).

¶ 42. The town was also concerned with the environmental impact that a subdivision would have in this ecologically sensitive area (R. 30). As a result of that concern, the town ultimately determined that it was its duty to ensure that an ecologically fragile area was properly developed and that the best way to accomplish this goal was to carry out the development itself (R. 30). As a result of the review process by the several agencies, the size of the subdivision was reduced from thirty-six

(36) to twenty-four (24) lots, the entrances were changed, and an environmental corridor was created (R. 23).

¶ 43. Thus, contrary to the Intervenors' argument that the court of appeals overlooked the two-prong test of *Dammann*, the record clearly indicates that the town acted on behalf of the public welfare. It is necessary to comment on the argument of the Intervenors, set forth in their initial brief and at oral argument that the court of appeals decision weakens the protections afforded by the public purpose and public use requirements. Pet'r Br. at 21–23 (citing the takings provision of the Wisconsin Constitution Article I, Section 13).[15] While the Intervenors may be correct in asserting that the reason

---

[15] The following exchange took place at oral argument:

Justice Diane S. Sykes: If I could refocus us on the legal question that's presented here and that is the public purpose doctrine. Is there any distinction between the public purpose doctrine as a constitutional doctrine and the public use requirement in the takings law?

Attorney Kenneth W. Forbeck (representing the Town of Beloit): The public use requirement in what now?

Justice Sykes: In the takings law under the 5th amendment and its state counterpart.

Attorney Forbeck: There's no takings here that I know of, but I can't, to be candid with you . . .

Justice Sykes: But there's a distinction between the two constitutional concepts?

Attorney Forbeck: I know the public takings law was cited by other counsel, and candidly I think it's a completely different set of laws and set of rules. There's no taking being done here.

Justice Sykes: I understand there's no taking being done here.

Attorney Forbeck: Okay.

for the public purpose requirement and the public use clause under the doctrine of eminent domain is to protect individual property rights against the government, their argument that the court of appeals decision weakens not only the public purpose limitations, but also the protections of the public use clause fails. The eminent domain provisions of the 5th amendment establish that government may take private property if two requirements are met: (1) a public use has been determined; and, (2) just compensation is paid. U.S. Const. amend. V. Article I, Section 13 of the Wisconsin Constitution also states that "[t]he property of no person shall be taken for public use without just compensation therefor." Here, the property at issue was not

Justice Sykes: But I'm asking you if there's any distinction, any principled distinction between the two constitutional doctrines.

Attorney Forbeck: I don't know, I can't honestly answer the question.

Justice Sykes: Well let me ask it this way, perhaps this will spark something.

Attorney Forbeck: Okay.

Justice Sykes: Would the public purposes that you're asserting sustain the town's actions in this case be sufficient to sustain a condemnation/eminent domain taking of this property if it were privately held?

Attorney Forbeck: I don't think so, to answer your question.

Justice Sykes: The town could not force a sale on a private property owner based upon these public justifications?

Attorney Forbeck: Need ... and I've done municipal law for thirty some years now, I'm not a proponent of doing eminent domain first of all, number one. But number two is—I don't think you could show an eminent domain necessity to do this particular piece of property.

private property being taken. To the contrary, the property was currently owned by the town, and pursuant to Wis. Stat. § 61.34(3), the town has the authority to sell and subdivide the property. An entirely separate statute deals with a town's authority to condemn property under eminent domain. *See* Wis. Stat. ch. 32.

¶ 44. Although the test under the public use clause, like the test under the public purpose doctrine, is deferential to the legislative determination, the analyses are not identical. In any event, "[a] purely private taking could not withstand the scrutiny of the public use requirement." *Hawaii Hous. Auth. v. Midkiff,* 467 U.S. 229, 245 (1984). *See also Southwestern Ill. Dev. Auth. v. Nat'l City Envtl.,* 768 N.E.2d 1, 8–9 (Ill. 2002):

> While the difference between a public purpose and a public use may appear to be purely semantic, and the line between the two terms has blurred somewhat in recent years, a distinction still exists and is essential to this case . . . . [The] flexibility [in terminology] does not equate to unfettered ability to exercise takings beyond constitutional boundaries.

"[E]minent domain cannot be employed to take private property for a predominantly Private use; it is, rather, the means provided by the constitution for an assertion of the public interest and is predicated upon the proposition that the private property sought is for a necessary public use." *Baycol, Inc. v. Downtown Dev. Auth. of City of Fort Lauderdale,* 315 So.2d 451, 455. However, because this is not in fact a takings case, we need not and do not address whether the asserted public purposes of the Heron Bay project would be sufficient to sustain a challenge under the public use clauses of the Fifth Amendment and Article I, Section 13. Given the history surrounding the property at issue, it seems

clear that the combination of the town's enunciated goals would be difficult for individuals to achieve by themselves.

¶ 45. In addition, the Intervenors maintain that the town's pursuit of profit from the development is not allowed under the public purpose doctrine.[16] In support of that position, the Intervenors rely on *Heimerl v. Ozaukee County,* 256 Wis. 151, 40 N.W.2d 564 (1949). In that case, Ozaukee County attempted to enter into a contract to build private driveways for local residents and others using county employees and resources pursuant to Wis. Stat. § 80.106 (1947). The court there held: (1) that the Ozaukee County resolution was invalid, (2) that a public purpose was not satisfied because the benefit must be "direct and not merely indirect or remote." *Id.* at 157 (citing *Dammann,* 228 Wis. 2d at 180).

¶ 46. However, as noted by the court of appeals, there is nothing in *Heimerl* to suggest that municipalities may never engage in traditionally private business; rather, in that case, the court found that no public purpose was satisfied by Ozaukee County's expenditure of public funds to construct private driveways. *Town of Beloit,* 2001 WI App 256 at ¶ 28. As long as the primary purpose of the expenditure is for a public purpose, the fact that private individuals directly or indirectly benefit does not render the expenditure unconstitutional. *Libertarian Party,* 199 Wis. 2d at 810. While certain

---

[16] The Intervenors, along with Rock County, allege that the primary, if not exclusive, purpose behind the town's decision to subdivide Heron Bay, was a drive to maximize profit. *See* Pet'r Br. at 28, 31. Our review of the record does not find support for that allegation.

private individuals may indirectly benefit from the town's development, there are identifiable public purposes behind the activity. The town is not attempting to promote the expansion of a particular industry as prohibited by *Hermann v. City of Lake Mills,* 275 Wis. 537, 539–543, 82 N.W.2d 167 (1957),[17] nor is the town constructing the subdivision solely for the benefit of private owners as prohibited in *Heimerl v. Ozaukee County,* 256 Wis. 151, 40 N.W.2d 564 (1949).

¶ 47. Finally, as noted by the town, any profit realized from the sale of the subdivision would in fact benefit the Town of Beloit in that the profit would go into the Town Treasury and ultimately benefit all of the citizens of the town by way of decreased taxes and reduced debt. (*See* Def. Appellant Br. at 29.)

### III

¶ 48. In summary, the Town of Beloit had the statutory authority to subdivide and sell the property at issue. In addition, this court has recognized, pursuant to our decision in *Libertarian Party,* that purposes for legislative action such as increasing the tax base and creation of new jobs, along with other reasons, are legitimate public purposes justifying the expenditure of public funds. The expenditures by the Town of Beloit to develop and sell property in the subdivision are not in contravention of the United States and Wisconsin Constitutions, nor in violation of statutory provisions.

---

[17] *Hermann v. City of Lake Mills,* 275 Wis. 537, 82 N.W.2d 167 (1957), was distinguished by *Bishop v. City of Burlington,* 2001 WI App. 154, ¶ 13, 246 Wis. 2d 897, 631 N.W.2d 656, on a factual basis. The proposition for which *Hermann* is cited is valid, and bolstered by the holding in *Bishop. See Bishop,* ¶ 19 (" . . . we interpret *Hermann* to prohibit the use of public funds to promote the expansion of a particular industry").

¶ 49. This court holds that the combination of goals here of creating jobs, promoting orderly growth, enhancing the tax base, and preserving and conserving environmentally sensitive lands is a legitimate and valid public purpose justifying the expenditure of public funds by the Town of Beloit. Accordingly, we affirm the court of appeals decision.

*By the Court.*—The decision of the court of appeals is affirmed.

¶ 50. SHIRLEY S. ABRAHAMSON, CHIEF JUS- TICE *(dissenting).* I would affirm the order of the circuit court granting summary judgment to the inter- venors on the ground that the town's proposed expen- diture for the development of the subdivision did not serve a public purpose.[1]

¶ 51. An expenditure is for a public purpose if it provides a direct advantage or benefit to the public at large. It is not for a public purpose if the advantage to the public is indirect, remote, or uncertain.[2]

¶ 52. The constitutional public purpose test is satisfied when the purposes expressed by the legislative body or "conceived" by the court rationally justify the expenditure. In determining whether a public purpose

---

[1] I agree with the well-written decision of Circuit Court Judge William D. Johnston. Judge Johnston concluded that this expenditure does not meet the two-part test established in *State ex rel. Hammermill Paper Co. v. La Plante,* 58 Wis. 2d 32, 55–56, 205 N.W.2d 784 (1973): Is the expenditure for public necessity, convenience, or welfare? Would private individuals have diffi- culty in providing the subdivision for themselves? The answer to both questions in the present case is no.

[2] *Libertarian Party of Wisconsin v. State,* 199 Wis. 2d 790, 810, 546 N.W.2d 424 (1996) (citing *State ex rel. Wisconsin Dev. Auth. v. Dammann,* 228 Wis. 147, 277 N.W. 278 (1938)).

exists the judiciary accords the legislative branch deference and thus plays a limited role. Nevertheless, the court does not merely rubber-stamp government expenditures. The state and federal constitutions demand that courts perform their independent function to assess the realistic operation of the law to protect the public. A court "is not bound by the legislature's enactment or declarations regarding its purpose, for it is the court's constitutional burden to examine the challenged legislation and assess its realistic operation."[3]

¶ 53. The combination of goals enunciated by the majority opinion as constituting a legitimate and valid public purpose for the Town of Beloit's expenditures properly includes a list of benefits that might conceivably, in some circumstances, provide a direct benefit to taxpayers and thereby satisfy the public purpose doctrine. An expenditure of funds that is legitimately designed to create jobs, promote orderly growth, increase the tax base, and preserve an environmentally sensitive area is made for a public purpose.

¶ 54. I dissent in this case, however, to express my conviction that some of the goals on which the majority opinion rests its conclusion are merely assertions unsupported by the facts of this case while others are admittedly hoped for but distant outcomes, not justifications. The public purpose doctrine becomes a charade if a town may justify expenditures by merely offering enough of the proper buzzwords, "job creation," "orderly growth," "increasing the tax base," and "environment concerns," without any facts to back up the assertions.

---

[3] *Hopper v. Madison,* 79 Wis. 2d 120, 128, 256 N.W.2d 139 (1977).

Moreover, judicial review cannot begin and end simply with the recitation of those buzzwords, without any analysis.

¶ 55. I dissent because I conclude on the basis of this record that it is clear beyond a reasonable doubt that the taxpayers of the Town of Beloit will be paying taxes to support the sale of lots for the future construction of private housing from which any benefit to the taxpayers is indirect, remote, and uncertain.

¶ 56. I also write separately to object strenuously and vehemently to the continuing inclination of this court to reach-out-and-decide-issues-not-before-the-court, whether it does so off-handedly in footnotes or squarely in the opinion's text.

I

¶ 57. This case is before the court on summary judgment and so our analysis is based upon stipulated facts and affidavits. The parties' stipulation regarding the public purpose states only that the development is based on a policy decision that the town will be able to sell the lots to private individuals, realize a profit, expand the town's tax base, and open up the northwest side of the town in an orderly planned manner. The affidavits do not discuss any particular public purpose except in passing and in conclusory terms. Indeed, analysis of the record exposes the town's asserted justifications and those conceived of by the majority of this court as nothing more than a recitation of buzzwords.

¶ 58. I begin by looking at the four justifications upon which the majority opinion rests its holding: job creation, expanding the tax base, promoting orderly growth, and environmental conservation.

¶ 59. The majority opinion lists job creation as an express goal of the town's expenditure in this case, despite the fact that the town did not articulate that benefit as a goal in its stipulation, brief, or oral argument. Indeed, there is no evidence in the record that the Town of Beloit ever intended the expenditure of monies to develop and sell property in the Heron Bay subdivision to create jobs, let alone that the expenditure would in fact create jobs.

¶ 60. The majority opinion includes this noble public goal based solely upon a single affidavit from the town's attorney, asserting in broad terms, not necessarily related to this subdivision development, that "the Town of Beloit has a history of leading development for the benefit of its citizens. The purpose of development has been to develop jobs, a greater tax base for the community and places for citizens to live."

¶ 61. No evidence appears in the record of the types of jobs that would be created in this case, who would receive those jobs, or how long those jobs would last. The only jobs immediately on the horizon may be jobs related to development of the subdivision. If homes are constructed in the future, one-time construction jobs might be made available in the community. A public purpose cannot rest on conjecture alone.

¶ 62. The court's emphasis on the public purpose of preservation of an environmentally sensitive strip of land along the Rock River also amounts to reliance on buzzwords. This case began as a suit by the Town of Beloit challenging conditions that the County of Rock placed upon its approval for the development of the Heron Bay lands. One of the challenged conditions was that a 300-foot strip of land along the Rock River be dedicated as park and open space that would allow it to be open to the public. The Town of Beloit rejected this

approach to environmental conservation, arguing that the town had a better plan: preserve this area by extending the lots all the way to the river and imposing restrictive covenants prohibiting development in this area without permission of the lot owners or the town.

¶ 63. The validity of this environmental condition will apparently still be before the circuit court. The court of appeals noted that "because there seems to be a factual dispute whether the town will voluntarily create such an easement, we decline to consider whether the easement is an additional public purpose."[4] The majority opinion apparently feels no such restraint.

¶ 64. In any event, it is unclear why any expenditure of funds for subdivision improvement is necessary for environmental protection of land the town owns along the river. The monies expended go to the development of the sites, not the creation or enforcement of any environmental easement or covenant. According to the parties' stipulation, the public can access these lands for recreation and enjoyment at the present time. To conclude that the town is justified in expending funds for sewer, water, roads, gas, electricity, storm sewer management and any other appurtenances necessary for development of the subdivision for sale for homes because the public would benefit from no development on a particular strip of town-owned land is doublespeak.

¶ 65. The two other goals in the combination of objectives the majority opinion says supports the expenditures for a public purpose are the promotion of orderly growth and increasing the tax base. The town, however, makes no showing of the relationship of the

---

[4] *Town of Beloit v. County of Rock,* 2001 WI App 256, ¶ 26 n.6, 249 Wis. 2d 88, 637 N.W.2d 71.

subdivision to orderly growth. Orderly growth is accomplished by a master plan, zoning codes, and regulation of private land developers. The Town of Beloit has such a master plan in place. How the town is promoting orderly growth by development of the subdivision is therefore unclear. The majority opinion appears to have accepted the town's mere suggestion of promoting orderly growth. It certainly cannot base its conclusion on facts because the record is devoid of any such facts.

¶ 66. The final objective of the expenditures is to increase the tax base. The tax base will increase if the lots are sold and houses are constructed. Yet the stipulation states that the "Town has not sold any portion of the Heron Bay Lands as of this date [December 7, 1999]. The Town has no guarantee that anyone will purchase any of the future residential lots. . . . "

¶ 67. The majority opinion's combination of goals justifying the expenditures in this case thus boils down to this: the expenditure serves an acceptable public purpose because the town's tax base might be enhanced. I disagree with this position. An enhanced tax base from the sale of land and the construction of homes is an indirect, remote, and uncertain benefit of the expenditure in the present case and is not a sufficient public purpose to justify the town's running a for-profit real estate development business and engaging in the nontraditional enterprise of building residential home sites.

¶ 68. Next we turn to the two additional goals the town asserted as justifications for the expenditure in this case that the majority opinion rightly ignores. Both of them are similarly indirect, remote, and too uncertain to constitute public purposes.

¶ 69. First, the town freely admits in the stipulation that it is acting with the hope of making a profit.

71

The town has the power to sell property. The majority opinion goes to great length to explain this statutory authority. Even where a government entity acts pursuant to a valid law, however, it is still subject to the constitution and the public purpose doctrine. The issue in this case is whether the town may expend funds for subdivision development to make a bigger profit on the sale. No evidence was presented analyzing either the expected revenue or market demand for the lots. The justification of a hoped-for profit, pursued to its logical end, would justify the expenditure of public funds for any potentially profitable endeavor in which the town seeks to engage. That cannot be what the public purpose doctrine means.

¶ 70. Second, the affidavit from the town attorney asserts in broad terms, not necessarily related to this subdivision development, that development in the town is to provide places for citizens to live. Nothing in the record evidences a need for single-family residential housing or the lack of private capital to develop such housing.[5] Several private ventures proposed development of the land, but the Town rejected the proposals. In *Heimerl v. Ozaukee County*, 256 Wis. 151, 40 N.W.2d 564 (1949), the court held that building private drive-

---

[5] Private developers were rejected by the town. The statutes reflect a pattern authorizing villages and towns with village powers to increase housing but only for certain segments of the population and subject to limitations and prescribed procedures. *See, e.g.,* Wis. Stat. §§ 66.1203 (housing authority not for profit); 66.1213 (housing authorities for elderly persons); 66.1301 (urban development); 66.1335 (housing and community development authorities). One inference from these statutes is that a town does not have the power to provide housing for purposes not similar to those set forth in the statutes.

ways was not "allied with a public purpose" and declared the expenditures unconstitutional. Similarly, the development of river front lots in and of itself is not allied with a public purpose.

¶ 71. The public purpose doctrine demands deference to the legislative branches of government. Nevertheless, the court must examine the operational facts concerning government expenditures in order to determine whether a direct benefit to the public results.[6] No facts exist in the record in the present case or can be conceived by the court to support a public purpose. I therefore conclude, as did the circuit court, that the possibility of public benefit is too indirect, remote, and uncertain to sustain the expenditures.

II

¶ 72. There is a growing tendency for this court to reach out and decide issues that are neither squarely presented nor adequately briefed and argued by the parties.[7] In the present case, the majority opinion does exactly that in its discussion of the relationship between the public purpose doctrine and the public use doctrine under eminent domain. Specifically, the majority opinion declares that "[a]lthough the test under the public use clause, like the test under the public purpose doctrine, is deferential to the legislative determination, the analyses are not identical."[8] Because I believe that this tendency is detrimental to the development of Wisconsin law, I dissent.

---

[6] *See, e.g., State ex rel. Hammermill Paper Co. v. La Plante,* 58 Wis. 2d at 50–53; *State ex rel. Bowman v. Barczak,* 34 Wis. 2d 57, 70–71, 148 N.W.2d 683 (1967).

[7] *See* majority op., ¶ 43 n.15.

[8] Majority op., ¶ 44.

¶ 73. My dispute is not with the correctness of the legal analysis or conclusion the majority opinion reaches with regards to public purpose and public use.[9] I do not know whether the majority opinion is correct. The majority opinion offers no authority for these statements of law. It cites cases from other jurisdictions relating to public use that do not bind this court, and I do not understand the parenthetical comments included or the purpose of citing these cases.

¶ 74. My gripe is with the very existence of the discussion in the present case. The majority opinion's discussion is pure, unadulterated dicta, and it has no place in the court's opinion. The intervenors' brief merely cautions that a broad definition of public purpose might result in a broad definition of public use in eminent domain law, but neither the opposing parties nor amici argued or briefed the issue.[10]

¶ 75. The dangers of this court's inclination to reach out either in the text or in a footnote and decide an issue not before it, without full inquiry and without full discussion, are graphically illustrated in *State v. Petty,* 201 Wis. 2d 337, 548 N.W.2d 817 (1996), and *State v. Hansen,* 2001 WI 53, 243 Wis. 2d 328, 347, 627 N.W.2d 195.

¶ 76. In footnote 10 of the *Petty* decision, the court stated that it need not and therefore would not address a particular issue. In footnote 13, however, the *Petty* court then proceeded, in a cursory and superficial manner, to address the issue it previously stated it would not address.

¶ 77. The very issue referred to in footnotes 10 and 13 in *Petty* then reached the court in *State v.*

---

[9] Majority op., ¶¶ 43–44.

[10] *See* majority op., ¶ 43 n.15.

74

*Hansen.* The *Hansen* court, discussing the conflicting *Petty* footnotes and the *Petty* court's incomplete inquiry into the issue, refused to abide by *Petty* footnote 13, characterizing the footnote as "providing non-essential commentary." *Hansen,* 243 Wis. 2d 328, ¶ 32. This characterization, however, is problematic under Wisconsin law. Justice Wilcox, the author of the *Petty* opinion, and Justice Crooks, the author of the majority opinion in the present case, argued in their dissent in *Hansen* that it is the rule in Wisconsin that a discussion of issues not decisive of a controversy is a binding judicial act, not dicta. *See Hansen,* 243 Wis. 2d 328, ¶ 60 (Wilcox, J., dissenting) (citing *State v. Kruse,* 101 Wis. 2d 387, 392, 305 N.W.2d 85 (1981)).

¶ 78. The relationship between the public purpose doctrine and the public use doctrine under eminent domain will inevitably be raised in a case before this court. When that happens, some litigant will argue that the majority opinion is an obstacle to a thorough, thoughtful, and fully briefed consideration of the issue, asserting the rule of stare decisis and pointing out that the majority's discussion is binding precedent and not mere dicta.

¶ 79. The majority's discussion of the relationship between public purpose and public use under eminent domain, however, is mere dicta, and should the issue ever squarely present itself in this court, litigants and justices will be wise to abide by the other line of Wisconsin cases that assert the generally accepted doctrine that "a statement not addressed to the question before the court or necessary for its decision" is dictum, *Am. Family Mut. Ins. Co. v. Shannon,* 120 Wis. 2d 560, 565, 356 N.W.2d 175 (1984), and not binding on the court, *Reiter v. Dyken,* 95 Wis. 2d 461, 474, 290 N.W.2d 510 (1980).

¶ 80. For the reasons set forth, I dissent.

¶ 81. I am authorized to state that Justice ANN WALSH BRADLEY joins this dissent.